J-S02013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: N.R.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.E.W., FATHER | |
| | No. 2147 EDA 2024 |

Appeal from the Decree Entered August 12, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000365-2023

| | |
|---|---|
| IN THE INTEREST OF: A.R.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.E.W., FATHER | |
| | No. 2148 EDA 2024 |

Appeal from the Decree Entered August 12, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000366-2023

BEFORE:  LAZARUS, P.J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED MAY 7, 2025**

L.E.W. (Father) appeals from the decrees,[1] entered in the Court of Common Pleas of Philadelphia County, Family Division, involuntarily terminating his parental rights to his children, N.R.H. (born February 2021) and A.R.H. (born May 2022) (collectively, Children), pursuant to 23 Pa.C.S.A.

_____

[1] On August 22, 2024, this Court *sua sponte* consolidated Father's appeals at 2147 EDA 2024 and 2148 EDA 2024.   **See** Pa.R.A.P. 513.

§§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[2]   After careful review, we affirm.

On February 9, 2021, the Philadelphia Department of Human Services (DHS) received a General Protective Services (GPS) report alleging that M.H. (Mother) had recently given birth to N.R.H.  Mother suffers from various mental and intellectual disorders, for which she was prescribed several medications.  DHS learned that N.R.H. was experiencing withdrawal symptoms from Mother's prescription medications and, as a result, N.R.H. was hospitalized.  On February 17, 2021, when N.R.H. was ready for discharge from the hospital, DHS obtained an order of protective custody (OPC).  N.R.H. was placed in a foster home through Bethany Christian Services.  On February 19, 2021, at a shelter care hearing, the trial judge, the Honorable Vincent Furlong, lifted the OPC while ordering N.R.H.'s temporary commitment to DHS to stand.[3]

On March 3, 2021, the Greater Philadelphia Community Alliance's Community Umbrella Agency (CUA) held a single case plan (SCP) meeting with Mother and Father.  Father's "objectives were to complete all Childline, Pennsylvania State Police, and Federal Bureau of Investigation (FBI)

_____

[2] *See* 23 Pa.C.S.A. §§ 2101-2938.

[3] Judge Furlong held hearings from February 19, 2021, through January 20, 2022.  Starting with a permanency review hearing on April 20, 2022, the Honorable John Sabatina, Jr., presided over all hearings through the termination hearings.  It is unclear from the record why Judge Sabatina replaced Judge Furlong.

clearances; allow CUA to assess his residence; sign all necessary [releases of information (ROI)]; cooperate with CUA; and engage in [Achieving Reunification Center (ARC)] services." Trial Court Opinion, 10/31/24, at 4. The SCP goal was reunification.

On May 21, 2021, Judge Furlong held an adjudicatory hearing. That hearing was continued, and the court ordered Mother and Father have separate community visits with N.R.H. The court also referred Mother and Father to the Clinical Evaluation Unit (CEU) for drug screenings, followed by three random screenings, and home assessments of Mother and Father's residences. On June 30, 2021, the court adjudicated N.R.H. dependent and committed him to the custody of DHS.

At a permanency hearing on January 20, 2022, the court found that N.R.H. was not "medically up to date" and was in treatment-level foster care through Bethany Christian Services. *Id.* at 5. The court ordered that N.R.H. remain in foster care placement and granted Mother and Father weekly supervised visits. Additionally, the court ordered Father sign all necessary ROI and referred him to ARC for applicable services. Father was also referred for anger management and parent education classes, and he was ordered to comply with CUA home assessments.

On March 7, 2022, the CUA held an SCP meeting in which Mother and Father did not participate. Father's objectives "were to complete all ChildLine, PA State Police, and FBI clearances; allow CUA to assess his residence; sign

all necessary ROI, cooperate with CUA; and engage in ARC services." *Id.* at 6. The goal for N.R.H. remained reunification.

On May 4, 2022, DHS received a GPS report alleging A.R.H. had recently been born. While A.R.H. presented as normal and healthy, Mother continued to suffer from various intellectual and mental disorders and lacked stable housing. On May 16, 2022, DHS obtained an OPC for A.R.H. Following a shelter care hearing on May 18, 2022, A.R.H. was placed in a Bethany Christian Services foster home. On June 30, 2022, Judge Sabatina, Jr.,[4] adjudicated A.R.H. dependent and found "A[.R.]H. was without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." *Id.* at 7. The court ordered A.R.H. be fully committed to DHS. On August 30, 2022, the CUA held an SCP meeting, in which Mother and Father did not participate. Father's objectives "were to complete all ChildLine, PA State Police, and FBI clearances; allow CUA to assess his residence; sign all necessary ROI; cooperate with CUA; and engage in ARC services." *Id.* at 8. The goal for Children was reunification.

At a permanency review hearing held on September 29, 2022, the court ordered that Children remain as committed and placed after finding N.R.H.

_____

[4] *See* note 3, *supra*, for discussion on Judge Sabatina replacing Judge Furlong in these matters.

received services through Elwyn[5] and A.R.H. received physical therapy. The court ordered Father to have one-hour weekly supervised, line-of-sight and line-of-hearing visits, at CUA with 24-hour confirmation before and on the day of each visit. At a permanency review hearing held on December 15, 2022, the court again ordered that Children remain as committed and placed. The court ordered Father to have one-hour weekly supervised line-of-sight and line-of-hearing visits at CUA, with 24-hour confirmation the day before and on the day of each visit. If Father became aggressive in any manner during a visit, the visit would be terminated.

On February 28, 2023, the CUA held an SCP meeting, in which Mother and Father did not participate. Father's objectives "were to complete all ChildLine, PA State Police, and FBI clearances; allow CUA to assess his residence; sign all necessary ROI, cooperate with CUA; comply with court orders; visit as allowed by the court order; and attend ARC for parent education classes, housing, and employment assistance." *Id.* at 9. The goal for Children remained reunification. At a permanency review hearing on March 2, 2023, the court ordered that Children remain as committed and placed and ordered Father to have bi-weekly supervised visits, with line of sight and line of hearing, at CUA. At a permanency review hearing on June 1, 2023, the

---

[5] Elwyn Inc. is a multi-state nonprofit organization based in Elwyn, Pennsylvania, that provides "education, treatment, and support services to children and adults with autism, intellectual and developmental disabilities, and related behavioral health challenges." *About Elwyn*, https://www.elwyn.org/about-elwyn (last visited 4/4/25).

court again ordered that Children remain as committed and placed, and ordered CUA to make outreach to Father, who was now incarcerated. Father was incarcerated for approximately six months from March 3, 2023. *See* N.T. Termination Hearing, 8/12/24, at 65.

On September 13, 2023, DHS filed a petition for the involuntary termination of the parental rights of Father and Mother with respect to Children. The trial court held termination hearings on March 7, 2024, and August 12, 2024. Father and Mother were represented by counsel, and the children were represented by Aaron Mixon, Esquire, as their guardian *ad litem*. *See* 23 Pa.C.S.A. § 2313(a) ("The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents.").

The court heard testimony from Ashley Jeffries,[6] N.R.H.'s foster mother, A.R.H.'s foster father, Mother, and Father. The court found that both children "suffer from significant medical issues that require frequent care from doctors and specialists in many disciplines." Trial Court Opinion, 10/31/24 at 15; N.T. Termination Hearing, 3/7/24, at 10. N.R.H., for instance, "require[s] occupational and physical therapy, was diagnosed with developmental delays, suffer[s] from sleep apnea, and would require multiple surgeries." Trial Court Opinion, 10/31/24 at 15; N.T. Termination Hearing, 3/7/24, at 12-16.

---

[6] Jeffries is the CUA case manager assigned to N.R.H. and A.R.H. Jeffries has been the assigned case manager since November 2022.

N.R.H.'s foster mother testified that Father (and Mother) never attended any of N.R.H.'s medical appointments or inquired as to N.R.H.'s medical conditions. *See* N.T. Termination Hearing, 3/7/24, at 32. Moreover, she testified that she and N.R.H.'s foster father "completed extensive training to be certified as a medical foster home so that N.R.H. could be discharged to their care." Trial Court Opinion, 10/31/24, at 15-16; N.T. Termination Hearing, 3/7/24, at 12-16. Conversely, neither Father nor Mother were involved in the training to receive the same certification. *See* N.T. Termination Hearing, 3/7/24, 32. The trial court found that N.R.H.'s foster mother "credibly testified to loving N[.R.]H. like he was her son and noted that her children all love N[.R.]H. like a brother . . . [and] that she and her husband would love to adopt N[.R.]H." Trial Court Opinion, 10/31/24, at 16 (citing N.T. Termination Hearing, 3/7/24, at 22-31).

A.R.H. "was born with hypertonia[7] and diagnosed with global development delay . . . [and] sees many specialists, including a neurologist, occupational and physical therapists, an ear, nose, and throat specialist for issues related to ear infections, an ophthalmologist, and a speech therapist." *Id.* at 16; N.T. Termination Hearing, 3/7/24, at 37-39. A.R.H.'s foster father testified that A.R.H. came under his care only 15 days after A.R.H. was born

---

[7] "Hypertonia is the abnormal increase in muscle tone as a result of upper motor neuron lesions. [] Without effective management, hypertonia can result in muscle imbalance, abnormal movement patterns, pain, joint contracture, joint deformity, and ultimately negatively impact a patient's function." https://pubmed.ncbi.nlm.nih.gov/28716516/ (last visited 4/4/25).

and sees three specialists per week.  *See* N.T. Termination Hearing, 3/7/24, at 35-36.  He further testified that "A[.R.]H.'s [M]other and [F]ather have not attended any of A[.R.]H.'s medical appointments and have not inquired about his medical conditions."   Trial Court Opinion, 10/31/24, at 16; N.T. Termination Hearing, 3/7/24, at 48-49.  A.R.H.'s foster father testified that "[h]e and his family would very much like to adopt A[.R.]H."  Trial Court Opinion, 10/31/24, at 17 (citing N.T. Termination Hearing, 3/7/24, at 42-44, 52).

The court also heard testimony from Jeffries, who has supervised this case since November 16, 2022.  As it relates to Father, Jeffries testified that her communication with Father has been inconsistent, and "at one point [Father] had not been in touch with her for almost a year.  She stated that [Father] has refused to talk to her on multiple occasions and even hung the phone up on her during a telephonic communication."  *Id.* at 18-19 (citing N.T. Termination Hearing, 8/12/24, at 30).  Jeffries further testified that Father refused to acknowledge his SCP objectives, did not engage in any ARC services, and would not discuss his housing situation with her.  *See* N.T. Termination Hearing, 8/12/24, at 30-33.  Jeffries said that Father attended one supervised visit at CUA in 2022 and one in 2024.  *See* N.T. Termination Hearing, 8/12/24, at 34-35.  Jeffries "noted that she has never heard [C]hildren ask for Father and that Father has been incarcerated for much of the time she has supervised this case." Trial Court Opinion, 10/31/24, at 18-19 (citing N.T. Termination Hearing, 8/12/24, at 37-38).  Jeffries later testified

that Children have progressed well in their respective foster homes, where their medical and other needs are satisfied. *Id.* at 19-20. Jeffries testified that Children refer to their respective foster parents as "mom" and "dad" and would suffer irreparable harm if they were removed from their foster homes. *Id.* She also testified that Children would suffer no irreparable harm if Father's parental rights were terminated. *See* N.T. Termination Hearing, 8/12/24, at 38.

Father testified that he is unemployed and living in a city shelter, supporting himself with a series of "odd hustles" such as cutting grass, selling cigarettes, and passing out fliers. Trial Court Opinion, 10/31/24, at 20 (quoting N.T. Termination Hearing, 8/12/24, at 66). Father acknowledged that one of his children did not seem to recognize him at the beginning of a supervised visit, but later recognized him once Father began reading the Bible. *Id.* (quoting N.T. Termination Hearing, 8/12/24, at 68-69). The court found that "Father seemed to blame [] Jeffries exclusively for his failure to achieve his [SCP] objectives or attend visits with [C]hildren," quoting testimony in which Father said Jeffries was "a very nasty person" and "standoffish," adding that "[s]he has lied [about Father] most of the time." *Id.* at 20-21 (quoting N.T. Termination Hearing, 8/12/24, at 67).

Ultimately, the court was "confounded by Father's unwillingness to engage with CUA or take any steps whatsoever that could have potentially led to reunification." *Id.* at 21. Father's "inability, or unwillingness, to accomplish any of his SCP objectives throughout the history of the case proved to the trial

court that the conditions which brought [ C]hildren into care had not been remedied." *Id.*

At the end of the hearings, the trial court granted the petition to involuntarily terminate Father's parental rights, finding "clear and convincing evidence existed to . . . pursuant to 23 Pa.C.S.A. §[§] 2511(a)(1)[,] (2)[,] (5)[, and] (8)." *Id.* at 22.[8] The court also found that "pursuant to [subsection] 2511(b), the termination of [] Father's parental rights would not have a detrimental effect on the Children and that it was in the Children's best interests." *Id.*

Father filed separate notices of appeal and a Pa.R.A.P. 1925(b) statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i) (requiring concise statement of errors complained of on appeal to be filed and served concurrently with notice of appeal in children's fast track appeals). The trial court has filed a Rule 1925(a) opinion.

On appeal, Father raises the following issues for our review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, [] pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), where Father presented evidence that he tried to perform hi[s] parental duties, but was not permitted to actively participate in case planning.

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, [] pursuant to 23 Pa.C.S.A. [§] 2511(a)(2), where Father presented evidence that he has worked to remedy his situation and has the present

_____

[8] Mother has filed separate appeals at 2288 EDA 2024 and 2289 EDA 2024.

capacity to care for [C]hildren, even without the support of the foster care agency.

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, [] pursuant to 23 Pa.C.S.A. [§] 2511(a)(5), where evidence was provided to establish that [C]hildren [were] removed from the care of the Mother[,] and Father is capable of caring for his children.

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, [] pursuant to 23 Pa.C.S.A. [§] 2511(a)(8), where evidence was presented to show that Father is capable of caring for [C]hildren, even without the assistance of the agency.

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, [] pursuant to 23 Pa.C.S.A. [§] 2511(b), where evidence was presented that Father was involved in raising [C]hildren[,] but was not afforded the opportunity to strengthen that bond with [C]hildren.

Brief of Appellant, at 7.

Our standard of review in cases involving termination of parental rights "is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 442 (Pa. Super. 2017). After considering all of the evidence, and the legal conclusions and findings of the trial court, "[w]e reverse only if we find an abuse of discretion, an error of law, or insufficient evidentiary support." *In re K.C.F.*, 928 A.2d 1046, 1049 (Pa. Super. 2007). An abuse of discretion is "the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record."

*Commonwealth v. Nicoletti*, 328 A.3d 85, 90 (Pa. Super. 2024). The trial court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). If the trial court's decision is supported by competent evidence, this Court will affirm even if the record could support the opposite conclusion. *Id.*

The trial court terminated Father's parental rights pursuant to subsections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. This Court need only agree with the trial court as to one subsection of section 2511(a), as well as section 2511(b), to affirm the termination of Father's parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

In his first issue, Father argues the trial court erred or abused its discretion when it terminated his parental rights pursuant to subsection 2511(a)(1). Specifically, Father argues he never evidenced a settled purpose of relinquishing his parental claims, saying he "worked to meet the SCP goals required of him, even without any referral for services from the agency," as he "completed anger management and parent[ education courses] while incarcerated." Brief of Appellant, at 15. Father claims the social workers on his case treated him unfairly, never contacted him, and did not include him in case planning, and that he "was never notified regarding how [ C]hildren were doing." *Id.* He also claims that he regularly visited Children before his

incarceration, but was not permitted virtual visits while he was incarcerated. ***Id.***[9]

Section 2511(a)(1) reads as follows:

**(a)** **General rule.**—The rights of parents in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

Pa.C.S.A. § 2511(a)(1).

DHS filed the petition for the involuntary termination of parental rights on September 13, 2023, so the statutory six-month review period of Father's conduct began on March 13, 2023. ***See*** 23 Pa.C.S.A. § 2511(a)(1). Although section 2511(a)(1) "focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." ***In re Q.R.D.***, 214 A.3d 233, 241 (Pa. Super. 2019) (citation and quotation

_____

[9] Father raises the veiled argument that he was not permitted virtual visits with Children while incarcerated. However, our review of the record reveals no facts speaking to the conditions of Father's incarceration, and Father does not refer to any part of the record to support his claims. Accordingly, this part of Father's argument is waived. ***See*** Pa.R.A.P. 2119(c) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears.") (citation omitted). ***See also Hackett v. Indian King Residents Ass'n***, 195 A.3d 248, 255 (Pa. Super. 2018) (not responsibility of Superior Court to develop appellant's arguments).

omitted). The performance of parental duties "requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." ***In re Adoption of L.A.K.***, 265 A.3d 580, 587-88 (Pa. 2021). We also note that incarceration alone is an insufficient ground for the termination of parental rights. ***See In re Adoption of S.P.***, 47 A.3d 817, 822 (Pa. 2012); ***In re K.J.***, 936 A.2d 1128, 1133 (Pa. Super. 2007).

Moreover, "when a child is placed in foster care, a parent has an affirmative duty to work toward the return of the child." ***In re Diaz***, 669 A.2d 372, 377 (Pa. Super. 1995). This duty, "at a minimum, requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities." ***Z.B. ex rel. A.B.***, 315 A.3d 153, 161 (Pa. Super. 2024) (quoting ***In re J.W.***, 578 A.2d 952, 958 (Pa. 1990) (citation omitted)). The agency must "put forth a good faith effort in making services available to the parent and, once it has done so on a continuing basis, it has discharged this obligation." ***In re Adoption of J.J.***, 515 A.2d 883, 890 (Pa. 1986).

After review, we conclude that the evidence demonstrates that Father was unwilling to cooperate with CUA despite good faith efforts by CUA to make services available to Father. ***In re Adoption of J.J.***, ***supra***. Father's SCP objectives were established on March 3, 2021. These included completing various clearances, cooperating with CUA, allowing CUA to assess his

residence, and engaging in ARC services. These objectives remained the same throughout the duration of the case. Jeffries testified that communication with Father was "very inconsistent" and that, at one point, she was not in contact with Father for close to a year. N.T. Termination Hearing, 8/12/24, at 30. Jeffries testified that she attempted to contact Father through various telephone numbers and an address that were on file, *id.* at 29, and, through a social worker, while he was incarcerated; all attempts were unsuccessful. *Id.* at 50. Once Father re-established contact after nearly one year without communication, Father hung the phone up on Jeffries when she mentioned discussing his case plan and visitations. *Id.* at 30. Jeffries testified that Father was referred to ARC services, but Father "did not avail himself to go to the ARC." N.T. Termination Hearing, 8/12/24, at 32. *See also In re Adoption of J.J.*, *supra*. When Jeffries "asked [Father] if he [also] wanted to [] do case planning[, h]e stated, no, and hung up the phone." N.T. Termination Hearing, 8/12/24, at 32.

Jeffries testified that Father refused to sign his SCP, as Father claimed that "he did not have a case." *Id.* at 32. Father testified to similar effect, saying that "[he] d[id] not have a case, [he was] only there because of [Mother's] mental health issues" and that he "did not want to know" the CUA employees. *Id.* at 66. Father testified that he had completed parenting and anger management courses while incarcerated and provided certificates of completion to Jeffries, *id.* at 66-67; however, Jeffries testified that she had no knowledge of Father completing a parenting program. *Id.* at 33.

- 15 -

Ultimately, Jeffries rated Father's compliance with his SCP as "none," and his progress towards reunification as "none." *Id.* at 37-38.

Father contends that he visited Children "consistently" before his six-month incarceration that began on March 3, 2023. Brief of Appellant, at 15. The record, however, shows that Father visited Children once in 2022, zero times in 2023, and once in 2024, just before the second hearing on the petition to terminate parental rights.[10] N.T. Termination Hearing, 8/12/24, at 34-35. *See In re Q.R.D.*, *supra* (holding court must consider whole history and circumstances of case and not mechanically apply six-month statutory review provision). Jeffries attempted to contact Father while he was incarcerated but received no response. N.T. Termination Hearing, 8/12/24, at 50. When asked why he had not visited his children more frequently following his release, Father criticized Jeffries, calling her "a very nasty person" and "standoffish," alleging "[s]he has lied most of the time." *Id.* at 67. Father, thus, had "chosen to stay away from" Jeffries and would not "deal with" CUA without working with his attorney. *Id.*

─────────────────────────────

[10] The trial court provided the following description of Father's 2024 supervised visit: "Jeffries described a strange visit during which Father told N[.R.]H., who was only three years old, 'I'm going to teach you how to keep your penis in your pants and not bring it out too early because girls, because these women, that's all they want.' During the same visit, Father said, 'I'm going to smash you for that one and treat you just like I treat your mother.' These statements were concerning to [] Jeffries." Trial Court Opinion, 10/31/24, at 19 (citing N.T. Termination Hearing, 8/12/24, 32-37). Father confirmed having this conversation with N.R.H. *See* N.T. Termination Hearing, 8/12/24, at 69-70.

Once Children were placed in foster care, Father had an affirmative duty to work toward the return of Children to his care. *In re Diaz*, *supra*. Instead, Father failed to establish consistent communication with CUA despite CUA's multiple attempts to establish contact through various channels. Father also made a deliberate choice to avoid CUA, foregoing consistent visits with Children in the process. Additionally, Father's refusal to acknowledge his SCP objectives throughout the history of the case demonstrates his failure to cooperate with CUA. *See Z.B. ex rel. A.B.*, *supra*. Father's lack of cooperation and communication with CUA, and his very infrequent visits with Children outweigh any good faith efforts Father may have exercised to maintain the parent-child relationship. *See In re Adoption of L.A.K.*, *supra*. Consequently, we conclude the trial court did not abuse its discretion in terminating Father's parental rights pursuant to section 2511(a)(1).

Having concluded that the record supports the trial court's section 2511(a)(1) determination, we will proceed to analyze Father's section 2511(b) claim. *See B.L.W., supra*. Father argues the trial court erred or abused its discretion when it terminated his parental claims pursuant to section 2511(b), which reads:

> **(b)** **Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by

the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

To support his issue on appeal, Father cites *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998), which held that the party seeking termination must present evidence concerning the effect of the termination on the child or children. "[A] court must give primary consideration to the needs and welfare of the child." (quoting 23 Pa.C.S.A. § 2511(b)). Against this backdrop, Father claims that he visited Children before his incarceration and argues that he "should have been provided with ongoing visits with his children [while he was incarcerated], so that he could continue to bond with his children." Brief of Appellant, at 19. Ultimately, Father argues that the best interests of Children would not be served by terminating his parental rights. *Id.*

This Court has held:

While a parent's emotional bond with his or her child is a major aspect of the [section] 2511(b) analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. **In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent**. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and **consider whether a parent is capable of providing for a child's safety and security** or whether such needs can be better met by terminating a parent's parental rights.

Furthermore, our Supreme Court has stated, common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. The Court directed that, in weighing the bond considerations pursuant to [section] 2511(b), courts must keep the ticking clock of childhood ever in mind. The [] Court observed, children are young for a scant number of years, and we have an obligation to see their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children.

*In re M.E.*, 283 A.3d 820, 837 (Pa. Super. 2022) (emphasis added) (internal citations and quotations omitted).

In determining whether a parent-child bond exists, this Court has said the bonding "must exhibit a bilateral relationship which emanates from the parents' willingness to learn appropriate parenting, anger management, drug rehabilitation and marital stability." *In re K.K.R.-S.*, 958 A.2d 529, 534 (Pa. Super. 2008) (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418-19 (Pa. Super. 2003) (Tamilia, J., dissenting)). In cases where there is no evidence of a bond between a parent and child, "it is reasonable to infer that no bond exists." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (citation omitted).

The court further found that "Father failed to make any progress toward reunification since these matters were opened," and it "was confounded by Father's unwillingness to engage with CUA or take any steps whatsoever that could have potentially led to reunification." Trial Court Opinion, 10/31/24, at 21. Although the trial court did not draw any clear conclusions about the parent-child bond between Father and Children, the record reveals no

- 19 -

evidence to observe or infer such a bond. *In re B.C.*, *supra*. Children had never been in Father's care. *See* N.T. Termination Hearing, 8/12/24, at 75. Children's foster parents testified that Father has not participated in any of his children's various medical appointments. *See* N.T. Termination Hearing, 3/7/24, at 32, 48-49. Jeffries testified that Father has never participated in any of Children's medical or early intervention appointments and does not inquire about those appointments. *See* N.T. Termination Hearing, 8/12/24, at 41-42. She stated that Father has not provided Children gifts or cards for holidays or birthdays. *Id.* at 42. Jeffries testified that Children do not share a parent-child bond with Father, that Children never ask about Father outside of Father's visits, and that Children would not suffer any irreparable harm if Father's parental rights were terminated. *Id.* at 38. Additionally, Father testified that neither of his children see him as their dad, saying "I am not in their head. I know they recognize me as the man who has been there and read them scriptures from the Bible. That is what they recognize." *Id.* at 68-69.

Father's section 2511(b) argument hinges on the contention that he "should have been provided with ongoing visits [while incarcerated] with his children, so that he could continue to bond" with them. Brief of Appellant, at 19. This argument ignores the fact that the record shows that the entire year before and the year after he was incarcerated, Father visited Children only once. *See* N.T. Termination Hearing, 8/12/24, at 34-35, 65. Additionally, Jeffries attempted to establish contact with Father while he was incarcerated

but received no reply. *Id.* at 50. Father's refusal to speak with CUA or visit his children more frequently when he was not incarcerated does not exhibit a willingness to establish a bilateral relationship. *See In re K.K.R.-S.*, *supra*. Further, Father fails to cite to the record to support his contention that he was not permitted visitations with Children while he was incarcerated. Accordingly, this part of his argument is waived. *See* Pa.R.A.P. 2119(c), *supra*; *Hackett*, *supra*.

The record also supports the trial court's finding that Children and their respective foster families share a strong bond. *See In re M.E.*, *supra*. The trial court found "[i]t [] clear . . . from the testimony that a parent/child bond existed between [] Children and their current foster parents," adding that "[t]he testimony of [] Jeffries and the foster parents were deemed to be credible and accorded great weight." Trial Court Opinion, 10/31/24, at 21. *See also In re M.M.*, *supra* (trial court free to make credibility determinations). At the time of the termination hearing, N.R.H. has been with his foster family for almost three years. *See* N.T. Termination Hearing, 3/7/24, at 10. N.R.H. suffers from developmental delays, autism, and feeding issues related to laryngomalacia and dysphagia, and requires various occupational and physical therapies. *Id.* at 10-14. He also has sleep apnea, has had surgeries on his penis, tongue, ears, and eye, and takes toddler formula to ensure he consumes enough calories. *Id.* at 12-16. His foster mother and foster father completed extensive training to become a certified medical foster home before N.R.H. could be released into their care. *See id.*

- 21 -

at 14. N.R.H. sees eleven specialists throughout the year, and multiple therapists every week. *See id.* at 16-17. N.R.H.'s foster mother testified that N.R.H. has made strong progress since N.R.H. has been in her care. *See id.* at 28. Additionally, N.R.H.'s foster mother testified that she "love[s] [N.R.H.] as her own son," that her other children "love" N.R.H., and that she and her husband would "love to adopt" N.R.H. *Id.* at 22, 30-31. Jeffries corroborated the testimony of N.R.H.'s foster mother, stating that N.R.H.'s foster siblings "see him as a little brother" and that N.R.H. "looks to [his foster parents] for all his care and his needs [and] [c]alls them mom and dad." N.T. Termination Hearing, 8/12/24, at 26-27. Jeffries further testified that N.R.H.'s foster family is meeting his daily needs and that removing N.R.H. from their care would cause "extreme[]" irreparable harm to N.R.H. *Id.* at 27-28.

Moreover, A.R.H.'s foster father testified that A.R.H. had been in his care since A.R.H. was two weeks old. *See* N.T. Hearing Volume 1, 3/7/24, at 35-36. At that point, A.R.H. was taking special medications, received a diagnosis for hypertonia, and was later diagnosed with global developmental delay. *See id.* at 37. A.R.H. receives neurological care, physical, and occupational therapies, and sees an ear, nose, and throat specialist, an ophthalmologist, and a speech therapist. *See id.* at 38-39. Typically, A.R.H. sees three specialists every week. *See id.* at 40. A.R.H.'s foster father testified that A.R.H.'s "progress is good," and outside of his developmental delays, A.R.H. is "a happy and healthy little boy." *Id.* at 40-41. He further testified that A.R.H. is "a smiling, talkative, fun" boy who is "[a]bsolutely affectionate" and

refers to his foster parents as "Mama [and] Dada." *Id.* at 42-43. A.R.H.'s foster father also testified that his three other children "are absolutely in love with" A.R.H. and view him as "their little brother." *Id.* at 44. He testified that he and his wife are interested in adopting A.R.H. *Id.* at 52. Jeffries corroborated this testimony, testifying that, in his foster home, A.R.H. is "progressing [and] getting his needs met [and] asking for when he wants his needs met." N.T. Hearing Volume 1, 8/12/24, at 40. Jeffries described A.R.H.'s interactions with his foster family as "[f]un[ and] loving" adding "[t]hat's who he goes to and gets his needs met on a daily basis." *Id.* at 41.

The record supports the trial court's finding that a parent-child relationship exists between Children and their respective foster families, who are both adoptive resources. Additionally, it is clear from the record that Children's various needs are satisfied by their foster families, who provide the children with love, comfort, security, and stability. *In re M.E.*, *supra*. Accordingly, we find no abuse of discretion or error of law in the trial court's decision to terminate Father's parental rights to Children under subsection 2511(b). *See In re K.C.F.*, *supra*.

Decrees affirmed.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/7/2025