**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2253 EDA 2025 |

Appeal from the Order Entered August 18, 2025
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No:  CP-51-DP-0000061-2024

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 13 2026**

J.C. ("Former Guardian") appeals from the August 18, 2025, permanency review order that removed him as a reunification resource for E.K.M. (DOB: 02/2016).[1]  Upon review, we affirm.

On December 10, 2023, E.K.M. was playing a game in his bedroom when he became angry after someone kept killing his character in the game.  ***See*** DHS Exhibit 2 (medical records) at 23.  He was so angry that he set his bed on fire. ***Id.***  E.K.M. explained that he had been collecting pieces of wood and sticks from outside and storing them in his room. ***Id.***  He tried starting a fire by rubbing sticks together, but was unsuccessful. ***Id.***  He then retrieved paper

---

[1] Sadly, both biological parents are deceased.  Mother passed away when Child was under two years old.  Father was murdered in 2022 during an altercation with the father of child who bullied E.K.M.'s older sibling.

Appellant is E.K.M.'s maternal grandfather and was awarded legal and physical custody in 2018.

and lit it on fire with a long lighter, then dropped the burning paper on his bed. *Id.* This caused the smoke detector to go off. *Id.*

When Former Guardian asked about the noise, E.K.M. told him the noise was coming from his phone. *Id.* The fire spread from the bed to the wood next to the bed and onto the floor. *Id.* at 24. When E.K.M. was unable to extinguish the fire, he alerted Former Guardian to the fire in his room. *Id.* As a former firefighter, J.C. was able to extinguish the fire without calling the fire department. *Id.* Once the fire was extinguished, E.K.M. admitted that he started it. *Id.* Angry by this admission, Former Guardian repeatedly hit E.K.M. all over his body. *Id.*

While at school two days later, on December 12, 2023, E.K.M. complained of pain on his side. *See* Dependency Petition, 1/24/24, ¶ 5(e). A school staff member asked E.K.M. to lift his shirt, and when he did, staff observed bruising "from the top of his chest to his navel, as well as bruising from the top to the middle of his back and bruising on both arms." *Id.* The school reported the bruising to the Philadelphia Department of Human Services ("DHS"). *Id.*

DHS made an unannounced home visit the same day. *Id.*, ¶ 5(f). Former Guardian was visibly upset and unhappy about the number of complaints made against him to DHS. *Id.* He admitted to hitting E.K.M. because he was angry about the fire as it could have left them homeless. *Id.* A few years prior, Former Guardian lost several family members in a house fire started by a cousin. *Id.* J.C. said he did not intend to leave marks on

E.K.M., but wanted to discipline him for starting the fire. *Id.* He apologized for his actions and stressed that it would not happen again. *Id.*

DHS spoke to E.K.M. separately. E.K.M. could not remember how the fire started. *Id.* He denied that Former Guardian caused the bruises and said they were from playing outside with friends. *Id.* E.K.M. said he felt safe at home. *Id.*

After the visit, DHS instructed Former Guardian to take E.K.M. to St. Christopher's Hospital for Children for a medical evaluation due to the visible bruises. *Id.*, ¶ 5(g). Former Guardian was argumentative and did not understand why he had to since all prior reports were unfounded. *Id.*

On December 13, 2023, E.K.M. was evaluated at St. Christopher's. *Id.*, ¶ 5(h). The bruises on E.K.M. were substantial enough to constitute physical abuse. *Id.* During the evaluation, hospital staff learned that E.K.M. has an extensive traumatic history. *See* DHS Exhibit 2 (medical records), at 24. Mother passed away when Child was around two years old. *Id.* Father was murdered during an altercation with the father of a child who bullied Child's older sibling. *Id.* E.K.M. is one of six children between Mother and Father – two of his siblings were in foster care, and the remaining children lived with Maternal Aunt. *Id.*

Additionally, Maternal Aunt expressed concern with E.K.M.'s behavior to hospital staff. *Id.* About a month prior to this incident, E.K.M. strangled a dog when he was angry. *Id.* E.K.M. knew what he did was wrong. *Id.* Although this was the first time Child started a fire, Maternal Aunt was

concerned to learn that he collected small twigs and sticks as part of his process. *Id.* She also stated that Child's behavior in school is poor and he constantly fights with other students. *Id.* E.K.M. has a behavioral support person at school, but they were unable to manage his behavior. *Id.*

Based on these concerns, E.K.M. was transported to Philadelphia Children's Crisis Response Center ("CRC") the following day for a mental health evaluation. *See* Dependency Petition, 1/24/24, ¶ 5(h), (j). Former Guardian did not grasp the severity of the situation. *Id.*, ¶ 5(h). He said that the bruising looked worse in the photographs because of the lighting. *Id.* DHS informed J.C. what services were needed before E.K.M. could return home. *Id.*, ¶ 5(j). Former Guardian responded that he would not be taking any classes and "reiterated that he would not be in this situation if [E.K.M.] had not started the fire." *Id.*

E.K.M. was discharged from the CRC to the home of maternal great aunt, V.W. *Id.*, ¶ 5(k). While at the CRC, E.K.M. was upset that he was unable to go home. *Id.*, ¶ 5(j). However, once he was settled in V.W.'s home, he was in "much better spirits" and felt safe there. *Id.*

On January 24, 2024, DHS filed a dependency petition. Adjudication was deferred on February 7 and March 7, 2024. E.K.M. was adjudicated dependent on May 6, 2024. Legal custody was transferred to DHS. Former Guardian was referred to BHS for an evaluation and to Achieving Reunification Center ("ARC") for anger management and parenting classes. The court made a finding of child abuse as to Former Guardian. The placement goal was

reunification, and Former Guardian was provided weekly supervised visitation at the agency.

A permanency review hearing was held on August 1, 2024. Former Guardian was again ordered to complete a BHS evaluation, anger management and parenting classes. Supervised visitation remained the same. The October 31, 2024, permanency review hearing was continued because the Community Umbrella Agency ("CUA") representative was unavailable. The November 7, 2024, permanency review hearing was continued because Former Guardian requested new counsel.

A second permanency review hearing was held on November 19, 2024, wherein the court found Former Guardian was minimally compliant with his permanency plan objectives and made minimal progress alleviating the circumstances that brough E.K.M. into care. Former Guardian was ordered to sign releases and to provide a current mental health treatment plan and detailed progress report from Mary Howard Health Center. He was also referred to undergo a parenting capacity evaluation ("PCE") and follow all recommendations. The February 20, 2025, permanency review hearing was continued because the DHS caseworker was unavailable. The February 25, 2025, permanency review hearing was continued because Former Guardian again requested new counsel.

A third permanency review hearing was held on March 24, 2025, wherein the court found Former Guardian was minimally compliant with his permanency plan objectives and made minimal progress alleviating the

circumstances that brough E.K.M. into care. The court further noted that Former Guardian had missed several scheduled visits with E.K.M. Former Guardian was again ordered to provide an updated mental health treatment plan with detailed progress notes from Mary Howard Health Center and undergo a PCE.

On June 13, 2025, DHS filed a petition for a goal change to adoption. Following a hearing on July 29, 2025, the court granted the petition, changed the goal to adoption, and removed Former Guardian as a reunification resource, stating:

> [DHS] has met its burden by clear and convincing evidence through credible witness testimony that reunification with [Former Guardian] is not a viable or safe option for this child.
>
> This child was severely beaten due to his behavior in the home, and [Former Guardian], throughout the entire life of this case – while he has engaged in some of the objectives, they have been of no success in allowing him to show that he would not engage in this abusive behavior again towards the child, and that's of grave concern to the court.
>
> It's also why I believe this child doesn't want to ever see [Former Guardian] and why he's negatively affected by ever encountering [Former Guardian] and why [Former Guardian's] visits have escalated to a point that they had to be moved out of one location [due to] the security concerns.

N.T. Hearing, 7/29/25, at 31-32. Legal and physical custody of E.K.M. remained with DHS and E.K.M. remained in kinship care with Maternal Great Aunt. The next permanency review hearing was scheduled for October 30, 2025.

Former Guardian filed a notice of appeal and concise statement matters complained of on appeal on August 28, 2025. He raises the following issues for our review, reorganized for ease of discussion:

Whether the trial court erred as a matter of law, violated [Former Guardian's] due process rights, and abused its discretion by failing to comply with the Juvenile Act, 42 Pa.C.S.A. § 6301 et seq.[:]

- in failing to afford [Former Guardian] a sufficient opportunity to be heard or resolve the alleged dependency concerns which brought the child into care[.]

- in proceeding with the termination and goal change hearing prior to the parenting capacity evaluation report being completed and [Former Guardian] afforded the opportunity to complete the recommendations therein[.]

- in failing to maintain the unity of the family[.]

Whether the trial court erred as a matter of law, violated [Former Guardian's] due process rights, and abused its discretion by determining that [DHS] met its burden in establishing the grounds for a permanency goal change under the Juvenile Act[.]

Former Guardian's Brief, at 3-4.

Before addressing the merits, we are compelled to conclude that Former Guardian has waived any issues for appellate review by failing to adequately develop the argument. *See Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009) ("where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."). We cannot locate any argument related to the statement of questions involved. Instead, Former Guardian's brief argues that (1) he has standing and an

opportunity to be heard; (2) a goal change order is appealable; (3) he was entitled to notice pursuant to 23 Pa.C.S.A. § 2513 that his custodial rights could be permanently denied at a goal change hearing; and (4) the court failed to adequately address the 42 Pa.C.S.A. § 6351(f) statutory factors before changing the goal to adoption.

Even if not waived, Former Guardian is not entitled to relief. We review cases involving a goal change[2] order for abuse of discretion:

> To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In Interest of L.T.*, 158 A.3d 1266, 1276 (Pa. Super. 2017).

Under the Juvenile Act, courts must conduct regular permanency hearings to review the permanency plan of the child. *See* 42 Pa.C.S.A. § 6351(e). At each permanency hearing, the court must consider the following, statutorily-mandated factors: (1) the continuing need for and appropriateness of the placement; (2) the appropriateness, feasibility and

---

[2] "[T]he phrase 'goal change' is used as a term of art that is synonymous with the juvenile court's mandated determination regarding 'the continuation, modification or termination of placement' that a juvenile court must render pursuant to 42 Pa.C.S.A. § 6351(f), (f.1), and (g) at the conclusion of every permanency hearing." *L.T.*, 158 A.3d at 1278 (citing *In re R.J.T.*, 9 A.3d 1179, 1183 n.6 (Pa. 2010)).

extent of compliance with the permanency plan developed for the child; (3) the extent of progress made toward alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child; (5) the likely date by which the placement goal might be achieved; and (6) whether reasonable efforts were made to finalize the permanency plan in effect. **See** 42 Pa.C.S.A. § 6351(f). "When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts toward placing the child in an adoptive home." **In re N.C.**, 909 A.2d 818, 823 (Pa. Super. 2006).

There is no law defining "reasonable efforts," however, our case law indicates:

> Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. By requiring only reasonable efforts to reunify a family, the statute recognizes that there are practical limitations to such efforts. It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutions a *reasonable* effort towards reunification. This Court has stressed that the agency is not expected to do the impossible and is not a guarantor of the success of the efforts to help parents assume their parental duties.

**In Interest of C.K.**, 165 A.3d 935, 942 (Pa. Super. 2017) (internal citations and quotations omitted).

Although preserving the family unit is a purpose of the Juvenile Act, "[t]he necessary implication of the Juvenile Act is that a parent who cannot or

will not meet the irreducible minimum requirements . . . within a reasonable time following state intervention may properly be considered 'unfit,' and may properly have parental rights terminated." **In re J.W.**, 578 A.2d 952, 958 (Pa. Super. 1990). "[P]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." **Id.** at 959.

> We think this affirmative duty, *at a minimum requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities.* The agency must, of course, put forth a good faith effort *in making services available to the parent*, and once it has done so on a continuing basis, it has discharged this obligation.

**Id.** (citing **In re Adoption of J.J.**, 515 A.2d 883, 890 (Pa. 1986)) (emphasis in the original). These principles apply equally to a person awarded permanent legal custody, as well as a person whose care, custody and control of the child is in question. **See Interest of Z.B.**, 315 A.3d 153, 161 (Pa. Super. 2024). "If a biological parent fails to make diligent efforts, then the court has the authority to end reunification services and terminate their parental rights." **Id.** While a court cannot terminate parental rights where they do not exist, it can "remove the person as a reunification resource and terminate services." **Id.**

Here, after considering the factors enumerated in Section 6351(f), as set forth above, the court concluded that there was clear and convincing evidence to warrant the removal of Former Guardian as a reunification resource. **See** Trial Court Opinion, 9/24/25, at 2. The primary reason is that

Former Guardian severely beat E.K.M. due to his behavior in the home and has not shown that he would not engage in similarly abusive behavior again. *See* N.T. Hearing, 7/29/25, at 32. Tiara Randall, CUA case manager, explained the agency's concerns:

> [Former Guardian] has completed his single case plan objectives with the parenting and anger management, and he has also been engaged with his mental health treatment for over 20 years, yet his behavior and his delivery with communication and how he presents [himself], here at court and at the agency, he's still very angry, he's still agitated. He's not understanding the appropriateness of how it affects [E.K.M.]

*Id.* at 17-18. The agency provided the court with several examples of J.C.'s poor behavior despite his purported compliance with the single case plan objectives. At some point prior to dependency, Child had a phone confiscated by school staff. *Id.* at 10. Child no longer attended that school, and the phone was no longer on school property. *Id.* Despite that, during the dependency proceedings, Former Guardian went to that school and berated staff to return the phone. *Id.* As a result of his behavior, and concerned for Child's safety, DHS would not state Child's current school on the record. *Id.*

In March of 2025, Former Guardian blocked Ms. Randall's phone number, and she was unable to communicate with him for the remainder of the dependency proceedings. *Id.* at 12. Prior to being blocked, Ms. Randall testified that J.C. "ha[d] always been aggressive [and] combative" when communicating with her. *Id.* For example, when Ms. Randall tried to explain

what needs to occur prior to reunification, "he trie[d] to over talk me to intimidate me[.]" *Id.*

Visitation with Child and Former Guardian initially took place at CUA. *Id.* at 13. During visits, there was a woman security guard present. *Id.* at 14. At one visit, Former Guardian threatened the security guard and stated that "he would've done something differently" when he was younger. *Id.* DHS was unsure what he meant, but for the safety of everyone involved, visits were moved to DHS where there are metal detectors and additional security protocols for outside visitors. *Id.* at 15.

Ms. Randall also expressed concerns with Former Guardian's behavior during the visits:

> His demeanor . . . starts off real good until he gets back in the [visitation] room. There's concerns about inappropriate conversations, age-appropriate conversations . . . between [J.C. and E.K.M.] [J.C.] communicates to [E.K.M.] as if . . . he's an adult and not a younger child.
>
> [J.C.] always ha[d] to be redirected to kind of shift the tone of the conversation, without making him feel chastised in front of [E.K.M.], but it still [didn't] register. The family support worker always ha[d] to try to throw in something to change the tone of the conversation.
>
> [J.C.] [didn't] pick up on what the family support worker [was] trying to put out there to not embarrass him in front of [E.K.M.]

*Id.* at 15-16. Former Guardian last visited E.K.M. on February 22, 2025, and E.K.M. no longer wanted to visit with him. *Id.* at 13, 27.

As a final example of Former Guardian's behavior, he showed up at the agency after a court hearing was continued and demanded to speak with

someone. *Id.* at 16. The director of intervention and a security guard went to speak with J.C. and de-escalate the situation. *Id.* Ms. Randall testified that Former Guardian "never sat down, he stood over top of everyone[,] yelling [and] kept repeating himself, 'no fire, no beating.'" *Id.* They again tried to explain to Former Guardian what he needed to do for E.K.M. to return to his home. *Id.* They were unsuccessful "because he was still aggressive, very combative, yelling, agitated, and then he ended up storming off[.]" *Id.* at 16-17.

Based on the foregoing, Ms. Randall testified that E.K.M. cannot safely return to Former Guardian's care, and Former Guardian was no longer a viable reunification resource. *Id.* at 22. After considering the factors set forth in Section 6351(f), the court determined that J.C. was not a viable option for reunification, and that reunification with J.C. was not in Child's best interest. *Id.* at 32. As a result, Former Guardian was removed as a reunification resource, and the permanency goal was changed to adoption. *See Z.B.*, *N.C.*, *supra.* We discern no abuse of discretion; Appellant is not entitled to relief.

To the extent that Former Guardian contends he was not given adequate time to be heard and/or resolve the dependency issues, we are not persuaded. Upon commencement of the dependency proceedings, an attorney was appointed to represent Former Guardian. Absent hearings that were continued, Former Guardian attended hearings up until and including February 25, 2025. Thereafter, Former Guardian did not personally appear, but his attorney was present on his behalf. Additionally, Child was adjudicated

dependent on May 6, 2024, and the goal was changed to adoption on July 29, 2025 – approximately 14 months later. Thus, Former Guardian was provided with adequate opportunity to be heard and time to resolve the dependency issues.

To the extent J.C. argues that the court abused its discretion when it changed the goal to adoption before he completed the PCE, that claim is without merit. On November 19, 2024, the court ordered Former Guardian to complete a PCE and follow all recommendations.[3] *Id.* at 21. J.C. refused to comply until DHS filed a petition for a goal change and scheduled a PCE for August 18, 2025, after the goal change hearing. *Id.* at 22. We agree with the trial court's assessment:

> [W]hile I respect your advocacy for your client, the only reason it hasn't taken place, and why it is now scheduled to take place after this hearing, is because he has refused to attend. So, there's no guarantee that he would actually attend the next scheduled appointment.
>
> * * * *
>
> So, I don't believe that waiting any for a PCE, which [Former Guardian] has refused to do on more than one occasion, is warranted in this case or in the best interest of this child.

*Id.* at 31.

Order affirmed.

---

[3] Ms. Randall testified that the PCE was ordered in March of 2025. N.T. Hearing, 7/29/25, at 21. However, the docket indicates that the court referred Former Guardian for a PCE on November 19, 2024.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/13/2026