J-S47002-23

2024 PA Super 88

| IN THE INTEREST OF: Z.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2248 EDA 2023 |

Appeal from the Order Entered August 30, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0072802-2009

| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.B. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2249 EDA 2023 |

Appeal from the Order Entered August 30, 2023
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No: CP-51-DP-0000484-2022

BEFORE: STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.*

OPINION BY STABILE, J.: **FILED APRIL 29, 2024**

T.B. ("Former Guardian") appeals from the August 30, 2023 permanency review orders that removed her as a reunification resource for

---

* Former Justice specially assigned to the Superior Court.

two minor children, A.B. (DOB: 01/2007) and Z.B. (DOB: 04/2009).[1] Upon review, we affirm.

The Philadelphia Department of Human Services ("DHS") first became involved with this family in July 2009 when S.B. ("Mother") left Z.B. at her paramour's home and never returned. Order for Protective Custody, 7/18/09. Shortly thereafter, protective custody was lifted and Z.B. returned to Mother. In 2012, Former Guardian was awarded permanent legal custody ("PLC")[2] of the children in Delaware County, Pennsylvania. Dependency Petition, 7/27/22, ¶ 5(b).

_____

[1] The parental rights of the biological parents have not been terminated and they remain parties to the dependency action.

[2] In a dependency action, permanent legal custody "may be a permanency goal when a caregiver makes a commitment to accept legal responsibility to raising the child, but is unwilling or unable to adopt the child." **See** Pennsylvania Child Welfare Resource Center Permanent Legal Custody Handout https://www.pacwrc.pitt.edu/Curriculum/209_CncrrntPlnnng1/Hndts/HO09_PrmnntLglCstdy.pdf (last visited March 28, 2024). "This is an arrangement whereby a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian. **Parental rights are not terminated**." **In re S.H.**, 71 A.3d 973, 977-78 (Pa. Super. 2013), *appeal denied*, 80 A.3d 778 (Pa. 2013) (emphasis added).

In a typical dependency case, the goal is reunification which provides the biological parent(s) an opportunity to correct the issues which led to dependency and ultimately regain custody of the child. Here, PLC is a *de facto* parent who may also be subjected to dependency proceedings, and the goal of reunification may also be considered. The term "reunification resource," as used here, is meant to refer to the attempt to reunify the children with the Former Guardian.

- 2 -

On April 19, 2022, DHS received a general protective services ("GPS") report which alleged numerous issues regarding Former Guardian's ability to care for the children. *Id.*, ¶ 5(c). Significantly, it was alleged that the children had poor hygiene and it was unknown if the children's educational needs were being met and when they last received medical or dental care. *Id.* It was further alleged that Former Guardian suffered from untreated mental health issues and the reporting source was concerned that her behavior could escalate if the Philadelphia Police Department conducted a welfare check. *Id.*

DHS visited the home the same day. *Id.*, ¶ 5(d). Z.B. answered behind a locked security door and was home alone because Former Guardian took A.B. to the store an hour earlier. *Id.* DHS observed that Z.B.'s clothing was stained, her hair was unkempt, she was delayed in her responses, and she displayed poor eye contact. *Id.* Z.B. did not have a telephone number for Former Guardian and did not know what to do if there was an emergency. *Id.*

Also on the same day, DHS received additional allegations that the children were not allowed outside of the home and friends and family were not allowed inside the home. *Id.*, ¶ 5(e). Additionally, it was alleged that Former Guardian has stated for several years that the police and FBI are coming after her, and that the children may believe it. *Id.* DHS spoke with Former Guardian on the telephone who denied the allegations and stated the children's fathers are after her and that they cut her car seats.[3] *Id.*, ¶ 5(f).

_____

[3] We note that the children were 14 and 16 years old when Former Guardian made this statement.

Former Guardian agreed to meet with DHS on the porch, but would not allow DHS to enter the home. *Id.*, ¶ 5(g).

Former Guardian admitted the children were not doing well academically, but denied that they were truant. *Id.*, ¶ 5(h). She also admitted that the children have not received medical or dental care because she was afraid of being followed to the doctor's office. *Id.* The children were last seen by a dentist in May 2015. *Id.* She informed DHS that the children slept on air mattresses because the home was once infested with bedbugs. *Id.* Former Guardian refused DHS's assistance in acquiring appropriate beds for the children, as well as housing assistance. *Id.* During the conversation, Former Guardian commented that DHS was just an extension of the district attorney's office that refused to investigate her claims. *Id.* When asked to prioritize the children's needs, Former Guardian stated that her litigations took precedence. *Id.*

On May 19, 2022, DHS filed a motion to compel Former Guardian's cooperation with the investigation because she refused DHS access to the home to assess the safety and well-being of the children. On May 31, 2022, the court granted the motion and ordered Former Guardian to allow a home assessment within 48 hours. Additionally, a hearing was scheduled for June 29, 2022.

Former Guardian's home was assessed by DHS on June 2, 2022, who observed holes in the dining room and kitchen ceilings and noted that there was no gas service. *Id.*, ¶ 5(n). Former Guardian was fixated on her criminal

- 4 -

complaints, stalking allegations, and a medical malpractice lawsuit, and requested DHS to detain the people harassing her. *Id.* Former Guardian was more concerned with the children's "safety" from the "illegal surveillance" than their medical needs. *Id.* She refused to sign a release for her prior mental health treatment, to undergo a mental health evaluation and to identify a resource for a safety plan. *Id.* Former Guardian told DHS not to return to her home. *Id.* DHS spoke with the children who confirmed that they rarely leave the home, and no one visits them. *Id.*

On June 21, 2022, DHS attempted a home visit, but were denied access. *Id.*, ¶ 5(q). The children spoke with DHS alone on the porch, but were given notepads and instructed to take notes about the questions asked. *Id.* Both children disclosed that they do not have contact with any family or friends because it would cause legal troubles. *Id.* The children attended school virtually and failed all their classes. *Id.*

Following a hearing on June 29, 2022, the court ordered Former Guardian to comply with DHS and Community Umbrella Agency ("CUA") to ensure the children's medical care is current. The court further ordered the children and Former Guardian to appear at the next court date. On July 14, 2022, Former Guardian did not attend the hearing and instead, sent A.B. with a note that Former Guardian was unable to attend due to a medical condition. *Id.*, ¶ 5(u). The motion to compel was withdrawn and Former Guardian was ordered to comply with DHS and CUA. *Id.*

On July 27, 2022, DHS filed a dependency petition. Adjudication was deferred on August 10 and August 17, 2022. On August 17, 2022, DHS went to Former Guardian's home after she missed the court hearing. Dependency Petition, 8/24/22, at ¶ 5(f). Z.B. answered the door and called Former Guardian, who instructed Z.B. to close the door. *Id.* Former Guardian then called DHS and said she was hospitalized and left the children in the care of an unidentified male friend. *Id.* Since DHS was unable to access the home, it obtained an order for protective custody that included a break-down order. *Id.*, ¶ 5(i). DHS was ultimately able to gain entry with the assistance of police, removed the children from the home and placed them in foster care.[4] *Id.*

On August 22, 2022, a shelter care hearing was held[5], wherein the order for protective custody was lifted and the children were ordered to remain in the temporary custody of DHS. Former Guardian was ordered to appear at the next court date. Adjudication was deferred on September 14 and October 3, 2022. On October 31, 2022, the children were adjudicated dependent. The trial court discharged Former Guardian's PLC from Delaware County and referred her to BHS for an evaluation and to comply with all recommendations. The placement goal was reunification, and supervised visitation with Former Guardian was at the children's discretion. The January 18, 2023 permanency

---

[4] DHS filed a supplemental dependency petition on August 24, 2022 to include what occurred on August 17, 2022.

[5] Former Guardian appeared via telephone.

review hearing was continued due to unavailability of Former Guardian's counsel and the CUA.

A permanency review hearing was held on March 7, 2023, wherein the court found Former Guardian was not compliant with her permanency plan objectives and made no progress towards alleviating the circumstances that brought the children into care. Visitation with Former Guardian remained at the children's discretion. The May 1, 2023 permanency review hearing was continued because the city solicitor was unavailable.

A second permanency review hearing was held on July 19, 2023. Former Guardian did not attend the hearing. At the outset, the court stated its intention of addressing whether Former Guardian should remain a part of the case and directed the city solicitor to subpoena her for the next hearing. N.T., 7/19/23, at 6-7. James Allen, CUA case worker, testified that the children are together in a therapeutic foster home and doing very well. *Id.* at 8, 21-22. Foster mother, D.A., expressed an interest in being awarded PLC of the children, but did not want to pursue adoption. *Id.* at 10-11, 22. Likewise, both children wish to reside with D.A. permanently and do not want to reunify or have continuing contact with Former Guardian. *Id.* at 11, 14, 22, 29-31.

The permanency review hearing continued on August 30, 2023, wherein the trial court incorporated the testimony from July 19, 2023. N.T., 8/30/23, at 7. Mr. Allen spoke with the children again on August 8, 2023, and confirmed that the children did not want to reunify or have any contact with Former

Guardian. *Id.* at 11. Moreover, Former Guardian refused all services that were offered, such as parenting classes, mental health treatment and BHS services. *Id.* at 15-16. Significantly, Mr. Allen had not been inside Former Guardian's home since the children were removed in July 2022. *Id.* at 17. At the conclusion of the hearing, the court removed Former Guardian as a reunification resource, stating:

> And let me be clear. With the kids no longer wanting to reunify, wanting PLC in their current home, and not even wanting to visit, I'm not even factoring in the fact that [Former Guardian] didn't comply with any Single Case Plan objectives from CUA.

*Id.* at 31.

By order dated August 30, 2023, the court maintained the children's permanency goal of reunification and concurrent goal of permanent legal custody with a non-relative.[6] Legal and physical custody of the children remained with DHS and the children remained in foster care. The order further stated that the children do not wish to visit or reunify with Former Gurdian, therefore, she was vacated as a reunification resource, as well as her court-appointed counsel after 31 days. The next permanency review hearing was scheduled for November 21, 2023.

On September 2, 2023, Former Guardian filed counseled notices of appeal and concise statements of errors complained of on appeal, which this

---

[6] PLC was added as a concurrent goal following the July 19, 2023 permanency review hearing. *See* Permanency Review Order, 7/19/23.

Court consolidated *sua sponte*. Former Guardian presents the following questions for our review:

> A. Whether the trial court erred when it vacated the legal guardian as a reunification resource for the child[ren] when the court goal remained reunification/return to guardian and/or parent and DHS did not ask or file for a change in goal?

> B. Whether the trial court erred when it vacated court appointed counsel for the legal guardian, when the court goal remained reunification with guardian or parent and DHS did not ask or file for a change in goal?

Former Guardian's Brief, at 5.

Before we address the merits, we must determine whether the orders from which Former Guardian appealed are appealable as it implicates our jurisdiction. ***See In Interest of N.M.***, 186 A.3d 998, 1006 (Pa. Super. 2018) (citing ***Kulp v. Hrivnak***, 765 A.2d 796, 798 (Pa. Super. 2000) ("[W]e lack jurisdiction over an unappealable order, it is incumbent upon us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order")). "Jurisdiction is purely a question of law; the appellate standard of review is *de novo* and the scope of review is plenary." ***Interest of J.M.***, 219 A.3d 645, 650 (Pa. Super. 2019) (quoting ***Barak v. Karolizki***, 196 A.3d 208, 215 (Pa. Super. 2018)).

Generally, only final orders are appealable. ***See*** Pa.R.A.P. 341(a). A final order is one that disposes of all claims and all parties. ***See*** Pa.R.A.P. 341(b). However, there are three limited exceptions: (1) interlocutory appeal as of right (Pa.R.A.P. 311); (2) interlocutory appeal by permission (Pa.R.A.P.

312); and (3) a collateral order (Pa.R.A.P. 313). Dependency matters do not end following a child's disposition and the fact that further proceedings are contemplated is not dispositive of the finality of the order. **See J.M.**, 219 A.3d at 651.

In the dependency context, this Court "must examine the practical consequences of the order to determine if the party challenging it has effectively been put out of court." **In re Interest of M.B.**, 565 A.2d 804, 806 (Pa. Super. 1989), *appeal denied*, 589 A.2d 692 (Pa. 1990). "Thus, . . . this [C]ourt acknowledges certain crucial points of finality when review is appropriate despite the fact that such determinations may be later modified by the trial court after further statutorily mandated review hearings are held." **Id.** at 808. Specifically, our Supreme Court has held that "[a]n order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered." **In re H.S.W.C.-B.**, 836 A.2d 908, 911 (Pa. 2003).

Here, the orders did not grant or deny a status change – the goal remained reunification throughout. PLC with a non-relative was added as a *concurrent* goal on July 19, 2023, which was not appealed. The question is whether the appealed orders effectively put Former Guardian out of court.

When Former Guardian was granted PLC in 2012, she obtained legal and physical custody of the children. **See** 42 Pa.C.S.A. § 6357 (rights and duties of legal custodian). The court vacated Former Guardian's PLC on October 31,

- 10 -

2022, thereby terminating her legal and physical custodial rights of the children. As such, we must determine the effect of the October 31, 2022 orders on Former Guardian's legal status in the dependency matters. While standing was not specifically raised and this Court is precluded from raising it *sua sponte*, it must be included in the analysis to reach our conclusion.

Generally, only a "party" has standing to participate in dependency proceedings. ***See In the Interest of M.R.F., III***, 182 A.3d 1050, 1055 (Pa. Super. 2018). Our case law limits "party" status to three classes of persons: (1) the biological parents of the child(ren); (2) the legal custodian of the child(ren); and (3) the person whose care and control of the child(ren) is in question. ***Id.*** Former Guardian is not a biological parent of the children and was no longer the legal custodian. She was, however, the person whose care and control of the children was in question at the dependency hearing. Therefore, Former Guardian was considered a party.

As a party, Former Guardian is entitled to legal representation, the opportunity to present evidence, cross-examine witnesses, and otherwise be heard. ***See*** 42 Pa.C.S.A. §§ 6337, 6338. On August 30, 2023, the court removed Former Guardian as a reunification resource and vacated her court-appointed counsel. The orders effectively put Former Guardian out of court as they removed her status as a "party"; therefore, we deem the August 30, 2023 orders to be final and appealable. ***See M.B., supra.***

The standard of review in dependency cases is well-settled:

> [A]ppellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually . . . they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determination of the trial court.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). Here, Former Guardian asserts that the court erred in finding that she is not a suitable reunification resource. Without providing any citations, she argues that the court did not have the authority to remove her as a reunification resource when the goal remained reunification. Former Guardian's Brief at 9. She "believes that as long as the court goal is reunification, she should be offered an opportunity to reunify with the children." *Id.* at 10. We disagree.

Under the Juvenile Act, courts must conduct regular permanency hearings to review the permanency plan of the child. *See* 42 Pa.C.S.A. § 6351(e). At each permanency hearing, the court must consider the following, statutorily-mandated factors: (1) the continuing need for and appropriateness of the placement; (2) the appropriateness, feasibility and extent of compliance with the permanency plan developed for the child; (3) the extent of progress made toward alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of

- 12 -

the current placement goal for the child; (5) the likely date by which the placement goal might be achieved; and (6) whether reasonable efforts were made to finalize the permanency plan in effect. *See* 42 Pa.C.S.A. § 6351(f). "When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts toward placing the child in an adoptive home." *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006).

There is no law defining "reasonable efforts," however, our case law indicates:

> Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. By requiring only reasonable efforts to reunify a family, the statute recognizes that there are practical limitations to such efforts. It is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutions a *reasonable* effort towards reunification. This Court has stressed that the agency is not expected to do the impossible and is not a guarantor of the success of the efforts to help parents assume their parental duties.

*In Interest of C.K.*, 165 A.3d 935, 942 (Pa. Super. 2017) (internal citations and quotations omitted).

Although preserving the family unit is a purpose of the Juvenile Act, "[t]he necessary implication of the Juvenile Act is that a parent who cannot or will not meet the irreducible minimum requirements . . . within a reasonable time following state intervention may properly be considered "unfit," and may properly have parental rights terminated." *In re J.W.*, 578 A.2d 952, 958

(Pa. Super. 1990). "[P]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *Id.* at 959.

> We think this affirmative duty, *at a minimum requires a showing by the parent of a willingness to cooperate with the agency to obtain the rehabilitative service necessary for the performance of parental duties and responsibilities.* The agency must, of course, put forth a good faith effort *in making services available to the parent*, and once it has done so on a continuing basis, it has discharged this obligation.

*Id.* (citing *In re Adoption of J.J.*, 515 A.2d 883, 890 (Pa. 1986)) (emphasis in the original).

While these principles are specific to a biological parent, we see no reason why they should not apply to a person who was awarded permanent legal custody. If a parent must make diligent efforts toward reunification, which at a minimum is cooperating with the agency, then it follows that a person with PLC whose care, custody and control of the children is in question must also make diligent efforts toward reunification. If a biological parent fails to make diligent efforts, then the court has the authority to end reunification services and terminate their parental rights. *See J.W., supra.* However, the court cannot terminate parental rights where they do not exist. What it can do is remove the person as a reunification resource and terminate services.

Here, after considering the factors enumerated in Section 6351(f), as set forth above, the court concluded there was clear and convincing evidence

to warrant the removal of Former Guardian as a reunification resource.[7] **See** Trial Court Opinion, 10/2/23, at 2. The primary reason is that the children, ages 14 and 16, adamantly expressed on numerous occasions that they did not want to reunify with Former Guardian. As discussed at length above, the children were removed from Former Guardian's care because she neglected the children's medical, dental, educational and social needs. Additionally, there are significant concerns regarding Former Guardian's mental health and her ability to care for the children.

Moreover, Former Guardian was uncooperative throughout the dependency proceedings. She refused to allow DHS in her home to assess the safety and well-being of the children. She admitted that the children were medically and educationally neglected, yet was more concerned about her lawsuits and whether she was being followed. Due to her lack of cooperation, DHS was forced to obtain a break-down order to remove the children. She refused all services DHS offered and prohibited DHS from entering her home. Serious safety concerns for the children continue to exist in the home and Former Guardian does not have the ability to meet the basic needs of the children. Therefore, the court found Former Guardian was not compliant with her permanency objectives and made no progress towards alleviating the circumstances that brought the children into care.

---

[7] No party has challenged the court employing a burden of proof by clear and convincing evidence. We accept, without deciding, the burden of proof used by the court, even if a lesser burden of proof would be the standard, as any error in this regard would be harmless in this appeal.

Accordingly, we find the court did not abuse its discretion in determining Former Guardian was not a viable reunification resource, effectively removing her from the case. **See R.J.T., supra.** Additionally, we note that the parental rights of the biological parents have not been terminated and are parties in the dependency matter. As such, reunification remains an appropriate goal because a biological parent could potentially reunite with the children. Therefore, Former Guardian's argument that she must be given an opportunity to reunite with the children because the goal remained reunification is misplaced; the reunification goal remained with a parent, not with her as the PLC.

Further, Former Guardian's argument that the court could not remove her as a reunification resource because DHS did not file for a goal change is without merit. The court can review the appropriateness of the goal *sua sponte*, provided it gives the party notice, which it did at the previous permanency review hearing on July 19, 2023. **See** Appellee's Brief at 11 (citing Pennsylvania Dependency Benchbook, § 14-2); **see also** N.T., 7/19/23, at 7, 31. Thus, Former Guardian had more than 15 days' notice that she may be removed as a resource at the permanency review hearing on August 30, 2023, and no procedural error occurred.

Finally, Former Guardian also asserts that the court erred when it vacated the appointment of counsel for Former Guardian. We disagree. The court directed the vacation occur 31 days after entry of the order, recognizing that Former Guardian was entitled to counsel if she chose to appeal. Former

Guardian is represented by counsel for this appeal. As discussed above, any rights to custody, care or control of the children were removed, as was her position as a party. Since she is no longer a party to the dependency matter, Former Guardian is not entitled to court-appointed counsel beyond the direct appeal process. *See* Pa.R.J.C.P. 1151(E). As a result, the court properly vacated counsel's appointment.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/29/2024