J-S10017-26
J-S10018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1610 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  CP-59-DP-0000051-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: Q.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1612 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  CP-59-DP-0000053-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: N.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1614 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  CP-59-DP-0000050-2023

J-S10017-26
J-S10018-26

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.R. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1625 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  CP-59-DP-000052-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: B.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.R., SR. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1611 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  CP-59-DP-0000051-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: Q.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.R. SR. | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1613 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  Cp-59-DP-0000053-2023

- 2 -

J-S10017-26
J-S10018-26

| | | |
|---|---|---|
| IN THE INTEREST OF: N. H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.R., SR. | : | |
| | : | No. 1615 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  CP-59-DP-0000050-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: D.R., SR. | : | |
| | : | No. 1626 MDA 2025 |

Appeal from the Order Entered October 20, 2025
In the Court of Common Pleas of Tioga County Juvenile Division at
No(s):  CP-59-DP-0000052-2023

BEFORE:  DUBOW, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:                          **FILED: JUNE 10, 2026**

M.R. ("Maternal Grandmother") and D.R., Sr. ("Maternal Grandfather") (together, "Maternal Grandparents"), appeal separately from the October 20, 2025 permanency review orders that changed the permanency goals from "return to parent or guardian" to adoption, with a concurrent goal of

- 3 -

permanent legal custodianship ("PLC"),[1] and removed Maternal Grandparents as parties to the dependency proceedings involving B.G. (a female born in June of 2012), Q.R., (a male born in April of 2013), N.H. (a female born in April 2017), and A.R. (a male born in November 2021) (collectively, "Children").[2]  Finding no abuse of discretion, we affirm the orders.

## Facts and Procedural History

S.R. ("Mother") is the natural mother of N.H., B.G., and A.R.  She is the adoptive mother of Q.R., whose natural mother and father are deceased.[3]  K.H. is the natural father of A.R. and N.H., and he was incarcerated during the underlying dependency matters.  G.G. is the natural father of B.G., who was

---

[1] PLC is a permanency goal in a dependency action that arises "when a caregiver makes a commitment to accept legal responsibility to raising the child, but is unwilling or unable to adopt the child."  **Interest of Z.B.**, 315 A.3d 153, 155 n.2 (Pa. Super. 2024) (citation omitted).

[2] We review Maternal Grandparents' appeals together as they raise similar issues and involves the same set of facts.

[3] Q.R.'s natural mother was another daughter of Maternal Grandparents, and she was already deceased when Tioga County Department of Human Services ("DHS") first became involved with this family in 2017.  **See** Order of Adjudication, 1/2/2023, ¶ 2.  Therefore, Q.R. was previously the cousin of B.G., N.H., and A.R.  **See id.**, ¶ 3.  Q.R. also has an older maternal half-sister, A.B., born in 2007, who has resided with Maternal Grandparents since DHS has become involved with this family.  **See id.**  A.B. is not a subject of the instant appeals.

serving a sentence of three and one-half years to twenty-two years of incarceration at all times relevant to these appeals.[4]

DHS has an extensive history of involvement with Mother and Maternal Grandparents, beginning in 2017 when it received a General Protective Services ("GPS") report alleging, inter alia, Mother's illegal drug use while residing in Maternal Grandparents' home. DHS learned through its investigation that Mother and her adult brother, D.R., Jr., either resided in, or frequently passed through, Maternal Grandparents' home. In addition, DHS learned that Maternal Grandparents had multiple grandchildren living in their home, for whom Maternal Grandmother was the primary caregiver. *See* Order of Adjudication, 1/2/2023, ¶ 23(a). DHS received a second GPS report concerning Mother's suspected drug use in 2019. Upon conducting a second round of investigation, DHS learned that Maternal Grandmother was awarded primary physical custody of her grandchildren pursuant to court orders, and Mother was awarded supervised visits.[5, 6] *See id.*, ¶ 23(b).

_____

[4] Neither Mother nor any of Children's fathers appealed the goal change decision.

[5] A.R. was not alive in 2019, but there is no dispute that he was also placed in Maternal Grandmother's legal and physical custody after birth by order of court.

[6] The record reveals that the legal and physical custody of Children resided only in Maternal Grandmother. However, the trial court identified Maternal Grandmother and Maternal Grandfather as "legal guardian" and/or "legal custodian" in Children's dependency matters.

- 5 -

In 2021, 2022, and 2023, DHS received additional GPS reports, all of which DHS ultimately validated. These reports alleged Mother's illegal drug use and that Maternal Grandmother allowed Mother to have unsupervised contact with Children, which resulted in Mother absconding with Children, and the police returning Children to Maternal Grandmother. *See id.*, ¶ 23(e), (f), (h).

Relevant to this disposition is the GPS report received by DHS on September 15, 2023, which averred that Maternal Grandmother left Children "unsupervised and alone with" D.R., Jr. *Id.* By that time, but on a date unspecified in the record, a "founded case [existed against D.R., Jr.,] of sexual abuse regarding his [natural] child," who was born in 2013.[7] *Id.*, ¶ 6. In addition, the report alleged, inter alia, that Maternal Grandmother neglected Children's medical and dental needs. *See id.* DHS made repeated attempts to investigate the GPS report from September 20, 2023, through November 7, 2023, but Maternal Grandmother denied DHS access to Children. *See id.*, ¶ 7. On November 7, 2023, DHS obtained a court order requiring Maternal Grandmother to allow DHS to interview Children and assess the safety of the home. After interviewing Children, DHS validated the GPS report.

On November 8, 2023, Children were removed from Maternal Grandparents' physical custody and placed in the emergency protective

_____

[7] D.R., Jr.'s, child is not a subject of these appeals.

custody of DHS. The trial court placed Children in shelter care on November 13, 2023, and DHS filed dependency petitions on that same date.

Following an evidentiary hearing, by orders of adjudication dated January 2, 2024, and dispositional orders dated February 6, 2024, the trial court adjudicated Children dependent and placed them in the legal and physical custody of DHS.[8] The trial court established "return to parent or guardian" as Children's placement goal and ordered that Maternal Grandparents

> shall participate in a behavioral health assessment, in lieu of a psychological assessment, and follow any/all recommendations that come from said assessment. As part of the behavioral health assessment for [Maternal Grandfather], the evaluator shall address whether or not there is an anger management issue for him.
>
> Visitation may be expanded into semi-unsupervised visitation for [Maternal Grandmother]. [D.R., Jr.,] shall not be involved in the visitations. [Mother] shall not be involved in [Maternal Grandmother]'s visitations. Discussions shall also not take place about what is going on in [c]ourt.

Dispositional Order, 2/6/2024, at 2. The trial court held permanency review hearings on April 2, August 6, and November 5, 2024. In the latter two hearings, the trial court found that Maternal Grandparents were in moderate compliance with the permanency plan because they had obtained behavioral health assessments and psychological evaluations. The trial court ordered

---

[8] Q.R., N.H., and A.R. were placed in kinship care with their maternal great-grandparents. B.G. was placed in the care of a man and woman who were close friends of B.G.'s paternal grandmother.

"that some of the visits take place in the [Maternal Grandparents'] home," if DHS determines that the home is safe, and that Mother and D.R., Jr., "shall not be present during the visits…." Permanency Review Order, 11/12/2024, at 4.

The next permanency hearing occurred on February 13, 2025, at which time Mother was incarcerated. The trial court found that Maternal Grandparents had made moderate progress toward alleviating the circumstances that necessitated Children's original placement and directed that DHS transition Children back to the home of Maternal Grandparents while maintaining DHS supervision. By the date of the next permanency review hearing on May 6, 2025, Children were in Maternal Grandparents' physical custody, and Mother remained incarcerated. Nonetheless, the permanency orders directed that Maternal Grandparents obtain a psychiatric evaluation, and that Maternal Grandfather additionally obtain a BIP[9] evaluation.

These permanency review orders also authorized Maternal Grandmother to obtain "routine and emergency medical, dental, or other care on behalf of" Children, "to access educational information regarding [Children], and … to participate in all educational meetings and activities." Permanency Review Order, 5/14/2025, at 3. The order cautioned Maternal Grandmother that DHS

_____

[9] The record does not reveal the full name associated with this acronym. In its brief, DHS confirms that the evaluation was to assess Maternal Grandfather's "propensity for domestic violence and need for related services." DHS's Brief (Maternal Grandfather's Appeal) at 20 n.7.

will not be prohibited "from obtaining medical or education records or services[,] nor shall the authorization [of Maternal Grandmother] be deemed to permit [Maternal Grandmother] to prohibit [DHS]'s access to [C]hildren or their records at any time." *Id.* With respect to D.R., Jr., the same permanency orders provided: "It has been previously DIRECTED that [D.R., Jr.,] shall not be allowed in any way around [C]hildren. It is still DIRECTED that [D.R., Jr.,] shall not be allowed in any way around or have any contact with [C]hildren." *Id.*

On May 27, 2025, DHS filed emergency petitions for modification of Children's placement, which sought to return Children to DHS's physical custody. DHS alleged in the petitions that on March 12, 2025, Children were returned to Maternal Grandparents' physical custody. Since then, DHS alleged that (1) on May 23, 2025, Maternal Grandmother denied DHS access to her home and to Children; (2) Children are in Maternal Grandfather's care while Maternal Grandmother is at work; and (3) Maternal Grandfather "has had an increase in erratic behaviors since Children have been returned to the home, particularly in the month of May." Emergency Petition, 5/27/2025, ¶ 5(c). Additionally, DHS noted that, at the most recent permanency review hearing, Maternal Grandmother testified that "she had allowed her son, [D.R., Jr.,] around [C]hildren." *Id.*, ¶¶ 5(a), 5(a)(i). Accordingly, DHS requested that Children be removed from Maternal Grandparents' physical custody. The trial

court granted DHS's petitions on May 27, 2025, and returned Children to their prior foster care placements.

On September 9, 2025, DHS filed petitions to change Children's permanency goals to adoption. With respect to Maternal Grandparents, DHS averred:

> Maternal [G]randparents, the legal guardians of [Children], have been uncooperative and have shown no progress since Children were removed again in May 2025. Prior to that, the grandparents showed very, very little progress alleviating the circumstances which led to placement, even admitting to having put [C]hildren in situations unnecessarily which placed them in [D.R., Jr.]'s proximity. Grandmother has maintained only [four] out of [eight] visitations available to her since the [hearing on the petition for modification of Children's placement]. Grandfather [has] attend[ed] no visits allowed to him and has engaged in no court-ordered services.

Petition, 9/9/2025, ¶ 27(b)(iii).

The proceeding underlying this appeal occurred on October 2 and October 20, 2025, during which DHS presented the testimony of Karen Farrer, the special education director for the Wellsboro School District; Meagan Gegg, the visitation aid; Aryn VanWormer, DHS caseworker; and Ken Nowak, DHS visitation supervisor and housing specialist. In addition, K.H., the natural father of N.H. and A.R., testified, as did G.G., the natural father of B.G. G.G. also presented the testimony of R.M., B.G.'s paternal grandmother. Maternal Grandparents testified separately.

By orders dated October 20, 2025, the trial court changed Children's permanency goals from return to parent or guardian to adoption, with

concurrent goals of PLC. In addition, the orders removed Maternal Grandparents as parties to Children's dependency cases and vacated Maternal Grandparents' separate court-appointed counsel. Specifically, the trial court determined that reunification with Maternal Grandparents "is no longer feasible nor in Children's best interests" because they made no progress toward alleviating the circumstances that necessitated Children's placement.[10] Permanency Review Order, 10/20/2025, at 3.

> There has been no cooperation or any progress for [Maternal Grandmother]; rather, a regression is noted [since Children's removal from her physical custody on May 27, 2025]. [Maternal Grandmother] only attended half of her visits with [C]hildren. [Maternal Grandmother] continues to refuse to bring activities for [C]hildren to do during the visits and does not see a reason to as [Children] are all different ages. When visits [do] occur, they are often chaotic. [Maternal Grandfather] does not participate in any services. [Maternal Grandfather] does not meet with [DHS] staff nor does he attend an[y] visitation.

*Id.* at 2 (cleaned up). The trial court also found that although Maternal Grandparents completed some of the court-ordered evaluations, they persistently "decline[d] to give [DHS] permission to see the

_____

[10] With respect to Mother, the trial court concluded that Mother's progress in alleviating the circumstances that required Children's original placement "continues to be moderate." Permanency Review Order, 10/20/2025, at 4, ¶ 2. Specifically, the trial court found that Mother was released from prison in late June 2025, and "is in drug addiction recovery." *Id.* In addition, the trial court found that K.H., the natural father of A.R. and N.H., "has been incarcerated during the pendency of this case, although he has transitioned to a halfway house...." *Id.*, ¶ 4. Likewise, the trial court found that G.G., the natural father of B.G., "has been incarcerated during the pendency of this case[, and] hopes to be paroled in early 2026." *Id.*, ¶ 5. In other words, the trial court found that Children's natural fathers are not reunification resources.

recommendations." *Id.* Further, with respect to Maternal Grandfather, the trial court found that he (1) does not meet with the Time Limited Family Reunification Services provider; (2) stopped attending counseling; and (3) has not completed his BIP assessment. *See id.*

Maternal Grandfather filed counseled notices of appeal from the goal change orders on November 18, 2025, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated sua sponte. Maternal Grandmother filed counseled notices of appeal along with concise statements on November 19, 2025, which this Court also consolidated sua sponte. The trial court filed its Rule 1925(a) opinion on December 15, 2025.

### Issues on Appeal and Standard of Review

Although Maternal Grandfather purports to raise four separate issues in his statement of questions involved, he includes only one argument in his brief before this Court. *Compare* Maternal Grandfather's Brief at 5, *with id.* at 10-16. Therein, he challenges the trial court's authority to change Children's goal and to remove Maternal Grandparents as parties to this matter given their in loco parentis standing, as it was their care and custody that was at

issue in the dependency matter.[11] ***See id.*** at 11-16. He further challenges

this decision as an abuse of the trial court's discretion.[12] ***See id.*** at 10-11.

Maternal Grandmother challenges the trial court's discretion to change

Children's permanency goal and to remove her as a reunification resource.

Maternal Grandmother's Brief at 7. Unlike Maternal Grandfather, Maternal

Grandmother acknowledges that the trial court had the legal authority to

_____

[11] As discussed below, this Court has recognized that a person is entitled to "party" status in dependency proceedings if that person's care and custody of the child is in question. ***Z.B.***, 315 A.3d at 159 (citation omitted). To the extent Maternal Grandfather argues that in loco parentis standing is somehow different and entitles him more rights than this Court has previously recognized, that claim is waived. He includes one statement in his brief contending "it was improper to remove him (them) as a party, not only because he has long had in loco parentis status, but also standing based on the enumerated factors heretofore." Maternal Grandfather's Brief at 12. This bald assertion lacks citation to the record, citation to authority, or any development whatsoever. ***See In re M.Z.T.M.W.***, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well[]settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Moreover, he failed to raise it before the trial court or in his Rule 1925(b) statement. ***See*** Maternal Grandfather's Concise Statement, 11/18/2025; Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

[12] We note with disapproval that Maternal Grandfather has failed to include any citations to the record or the proceedings that occurred below. ***See*** Pa.R.A.P. 2119(c) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears[.]"). We decline to quash or dismiss his appeal on this basis, as Maternal Grandmother has likewise raised this claim and we are able to dispose of both parties' assertions together.

remove them as parties to the case. *Id.* at 12. She contends, however, that DHS did not satisfy its burden of proving that it was in Children's best interests to change their permanency goal. *Id.* at 12-13. In her view, she was working towards reunifying with Children and complying with the court's orders and thus should have been allowed to continue to pursue reunification. *Id.* at 13-14.

Our standard of review in dependency matters is for an abuse of discretion. *Z.B.*, 315 A.3d at 160. The same standard applies to our review of the trial court's decision to change a dependent child's permanency goal. *See In re J.Y.*, 754 A.2d 5, 8 (Pa. Super. 2000).

> [A]ppellate courts must employ an abuse of discretion standard of review, as we are not in a position to make the close calls based on fact-specific determinations. Not only are our trial judges observing the parties during the hearing, but usually … they have presided over several other hearings with the same parties and have a longitudinal understanding of the case and the best interests of the individual child involved. Thus, we must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan. Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determination of the trial court.

*Z.B.*, 315 A.3d at 160.

### Legal Authority to Remove Maternal Grandparents as Parties

We begin by addressing Maternal Grandfather's claim that the trial court lacked the legal authority to remove Maternal Grandparents as parties to the dependency action when it determined that they were no longer a reunification

resource and changed Children's permanency goals. The law is clear, and DHS concedes, that Maternal Grandparents were correctly deemed to be parties to the initial dependency case, as it was their care and control of Children that was in question and Children were removed from their home. *See id.* at 159 ("Our case law limits 'party' status to three classes of persons: (1) the biological parents of the child(ren); (2) the legal custodian of the child(ren); and (3) the person whose care and control of the child(ren) is in question.") (citation omitted); *see also* DHS's Brief at 11.

Contrary to Maternal Grandfather's suggestion, party status in a dependency action is not infinite. For biological or adoptive parents, the trial court may grant a petition to terminate their rights, ending their status as a party in the underlying dependency matter. *See* 23 Pa.C.S. § 2311. Legal guardians and custodians of children do not have parental rights that can be terminated; thus, as we previously observed, the option instead would be to "remove the person as a reunification resource and terminate services." *Z.B.*, 315 A.3d at 161. Anything less would put a non-parent in a superior position than a parent is as it relates to his or her rights to the care and control of a child.

This case is controlled by our prior decision in *Z.B.* There, the children were removed from a caregiver who had previously been awarded PLC in a prior dependency matter. *Id.* at 157. The trial court appointed counsel to represent the former caregiver and ordered her compliance with permanency

plan goals to reunify with the children. *Id.* The former caregiver failed to comply, and the children expressed no interest in having any contact, let alone reunifying with her. *Id.* at 158. The trial court therefore removed the former caregiver as a placement resource and vacated her attorney's court appointment. *Id.* at 158, 160.

The former caregiver appealed, questioning, inter alia, the trial court's legal authority to remove her as a party and placement resource. *See id.* at 158-59. This Court observed that a trial court has an obligation to conduct regular hearings to review the appropriateness of the child's permanency plan, considering myriad factors related to the goal of achieving permanency for that child. *Id.* at 160 (citing 42 Pa.C.S. § 6337(f)). "When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts toward placing the child in an adoptive home." *Id.* (citation omitted).

The *Z.B.* Court found that these principles apply with equal force to the legal guardian of a child as they do to a child's parent. *Id.* at 161. Recognizing that parents who fail to make diligent efforts toward reunification risk the termination of their parental rights to their child, *Z.B.* held that legal custodians who similarly fail to comply with their goals to work towards reunifying with children removed from their care risk removal as a

reunification resource and termination of their party status in the dependency action. **Id.**

Maternal Grandfather attempts to differentiate **Z.B.** on the basis that "**Z.B.** dealt with a former guardian who was eventually awarded permanent legal custody to the children in that case," and here, "we are dealing … with biological grandparent(s), one of which was actually given custody, in a custody order[.]" Maternal Grandfather's Brief at 13 (cleaned up). This is a distinction without a difference, as in both cases, the custodian has a court order awarding legal custody of a child without any further involvement of DHS or the trial court. **See Z.B.**, 315 A.3d at 155 n.2 (explaining that upon finalization of the PLC goal, "a juvenile court discontinues court intervention as well as supervision by a county agency, and awards custody of a dependent child, on a permanent basis, to a custodian," without terminating the rights of the child's parents).

The trial court unquestionably had the legal authority to remove Maternal Grandparents as reunification resources and parties to Children's dependency matter. Maternal Grandfather's first claim is baseless.

### Trial Court's Discretion

We now address whether the trial court abused its discretion when it changed Children's permanency goals and removed Maternal Grandparents as reunification resources and parties to the underlying dependency case. Maternal Grandmother asserts that the record establishes she was making

diligent efforts toward reunifying with Children and reunification "was still viable." Maternal Grandmother's Brief at 11. She points to her completion of a psychological evaluation, attendance at supervised visits where she fed and worked on homework with Children, and that she signed paperwork for the school district to address the educational needs of "two of the children." *Id.* at 13 (citing N.T., 10/2/2025, at 12-22, 28, 60, 68-69). She further states she has moved into a new house, with room for Children. *Id.* (citing N.T., 10/20/2025, at 4, 53).

Maternal Grandfather identifies no efforts he (or Maternal Grandmother) made following the removal of Children from their care. *See* Maternal Grandfather's Brief at 10-11. He instead relies upon the care they gave to Children prior to their removal, stating that they "stood in the shoes of each of the parents, [for] the majority of these children's lives, and … supported these children, both financially and emotionally." *Id.* at 11.

As mentioned above, at each permanency review hearing, the trial court must make findings, in relevant part, regarding the following:

> (1) The continuing necessity for and appropriateness of the placement.
>
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
>
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> (4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

* * *

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;

> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S. § 6351(f)(1)-(6), (9).

With regard to what constitutes "reasonable efforts," we have recognized, "because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. By requiring only 'reasonable efforts,' the statute recognizes that there are practical limitations to such efforts." *Interest of K.M.*, 305 A.3d 116, 121 (Pa. Super. 2023) (cleaned up). As our Supreme

- 19 -

Court has long observed, "at a minimum," a parent or legal custodian must show "a willingness to cooperate with the agency to obtain the rehabilitative services necessary for the performance of parental duties and responsibilities." ***In re Adoption of J.J.***, 515 A.2d 883, 890 (Pa. 1986). "[A] parent who cannot or will not meet the irreducible minimum requirements set by the Juvenile Act within a reasonable time following state intervention may properly be considered 'unfit,' and may properly have parental rights terminated. ***Z.B.***, 315 A.3d at 161 (citation omitted).

The trial court in the case at bar found that Maternal Grandparents are not compliant with their permanency goals and were not an appropriate resource for reunification:

> [] Maternal Grandparents do not have a parental, nurturing bond with [C]hildren. Individually, Maternal Grandmother is kind to [C]hildren and cares for them. However, their bond is not the type that provides security, nurture, wellness, and comfort. They cannot or will not provide [for] the educational and health needs for [C]hildren. They will not cooperate with educators and health providers for [C]hildren. For some inexplicable reason, they are hostile toward those trying to help [C]hildren. They call people rude names. They will not follow rules. It is no wonder why when [C]hildren are together chaos reigns.

Trial Court Opinion, 12/15/2025, at 5-6, ¶ 13.

The court reviewed the factors pursuant to section 6551(f) and concluded that Children's placement continues to be necessary, but the existing plan to reunify Children with Maternal Grandparents was unworkable. ***Id.*** at 9. It found Maternal Grandparents had made no progress toward alleviating the need for Children's placement—referring to their progress as

"regressive"—and that the potential date for reunification with Maternal Grandparents was "non-existent." *Id.* at 9-10. Further, the court found Children were doing very well in their respective placements and that Maternal Grandparents have been a hinderance, not a help, throughout the life of Children's dependency. *Id.* at 10. It thus concluded that Children needed and deserved permanency, and that changing the goal for Children and removing Maternal Grandparents as a reunification resource was in their best interests. *Id.* (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003), as stating "[a] child's life simply cannot be put on hold in the hope that a parent will summon the ability to handle the responsibilities of parenting").

The record supports the trial court's conclusion. Both Maternal Grandparents were ordered to complete psychiatric evaluations and follow any recommendations of the evaluators. N.T., 10/2/2025, at 95-96. Although the record does reflect that Maternal Grandmother completed a psychological evaluation, she had not completed the psychiatric evaluation. *Id.* at 95. As to the completed psychological evaluation, Ms. VanWormer testified that Maternal Grandmother did not permit DHS to obtain a copy of the evaluation. *Id.* at 113. As a result, DHS was unaware of the recommendations, if any, made by the psychologist. *Id.* at 95-96.

DHS was able to confirm that Maternal Grandfather completed his psychiatric evaluation, but he similarly refused to sign a consent for DHS to

receive the results. *Id.* As such, DHS could not confirm whether the psychiatrist made any recommendations with which he was to comply. *Id.*

Visitation for Maternal Grandparents remained supervised at the time of the goal change hearing. Maternal Grandfather had not attended any since Children's most recent removal from his care. *Id.* at 98. He blamed Mr. Nowak for his absence: "I don't need to be intimidated, stared at, notes taken, while I am trying to keep a happy face for my children. I cannot show the anger in front of them and so I avoid the whole problem." N.T., 10/20/2025, at 101.

For Maternal Grandmother, contrary to her claims before this Court, not only has she missed "half of her own visits" with Children since their May 27 removal, the visits she did attend were often chaotic. *See id.* at 41, 55, 101. According to Ms. Gegg, the visitation aid, "[t]he kids are constantly fighting with each other physically and verbally. There's not really any control over the visit from" Maternal Grandmother. *Id.* at 41.

> [A.R] for instance gave [Maternal Grandmother] the middle finger at one of the visits. [Children] tell [Maternal Grandmother] to shut up. They're not her best friend anymore. They don't love her. And they just, half of the time, are not listening to what [Maternal Grandmother] has to say.

*Id.* at 42. Children are unkind to each other, at times for "almost … the entire visit going back and forth with each other." *Id.* at 47. Ms. Gegg also observed N.H. and A.R. hit and kick Maternal Grandmother, and that Children generally are physically violent with each other during the visits. *Id.* at 72. She testified

that Maternal Grandmother has told Children "to stop" and "that they act like a bunch of animals," but Children do not listen when reprimanded by Maternal Grandmother. *Id.* at 77. According to Mr. Nowak, Maternal Grandmother "threatens in visits a lot, but she never f[o]llows through with them. … [W]hen she threatens to end it, they act worse." N.T., 10/20/2025, at 15.

Ms. Gegg and Mr. Nowak described a community visit they both attended with Maternal Grandmother and Children in July or August 2025 at Hills Creek. During the visit, Ms. Gegg found D.R., Jr., Mother, and A.B. (the older half-sister of Q.R.) also present at the venue, maintaining a distance of approximately 200 yards from Children. *See id.* at 14-15; N.T., 10/2/2025, at 55-56, 99. This is of particular concern because the court orders prohibit D.R., Jr., from having any contact with Children.

As to Children's educational needs, Ms. Farrer, the special education director for the Wellsboro School District, testified that Q.R. has an individualized education plan ("IEP") for emotional support services, and that N.H. was in the process of being evaluated for an IEP as a result of "academic deficits in math and reading" and "emotional concerns." N.T., 10/2/2025, at 19-20. She explained that an IEP meeting occurred for N.H. on September 25, 2025. Although Maternal Grandmother was invited to attend, she failed to appear, prompting the DHS representative who was present to call her. *Id.* at 21-22. Ms. Farrer testified that Maternal Grandmother answered but hung up the phone before everyone present at the meeting finished introducing

themselves, instructing the DHS representative to "send any paperwork to her following the meeting." *Id.* at 22, 24. This was troubling as Maternal Grandmother was the educational decisionmaker for N.H. at the time, and Ms. Farrer had hoped to obtain "feedback" from her during the meeting about N.H.'s "strengths and needs." *Id.* at 25.

The school convened an IEP meeting for A.R. on September 11, 2025, which Maternal Grandmother initially attended, but, according to Ms. Farrer, stated "she wasn't going to stay and participate if I was there. The special education teacher and myself tried to encourage her to stay and participate and she opted to leave." *Id.* at 26. Maternal Grandmother specifically told the participants of the meeting that "it was a conflict of interest and she did not want [Q.R.] spoken about around" Ms. Farrer. *Id.* at 27. Ms. Farrer explained that Maternal Grandmother "asked if I was related to someone in [DHS], which I answered … yes, and at that point she shut down and was unwilling to speak with me, or stay for the meeting." *Id.* Ms. Farrer denied that she had ever spoken with her relative about Children outside the scope of her employment. *Id.* at 28.

Finally, the record supports the trial court's finding that Maternal Grandparents are both noncompliant and uncooperative with DHS. N.T., 10/20/2025, at 4. Although Maternal Grandmother testified that she obtained a new residence, the record reflects that she refused to allow DHS access to the home. Maternal Grandmother provided explanations in her testimony as

to why she did not let DHS into her residence, which the trial court clearly found to lack credibility. ***See id.*** at 53-54, 56 (claiming DHS "purposely come[s] during the day because they know I'm not there, so they can say I'm not complying"); ***but see id.*** at 4-5 (Ms. VanWormer testifying that Maternal Grandmother was home at least three or four times when she personally attempted to see the home).

Ms. VanWormer testified that in September 2025, she met with Maternal Grandmother in the DHS office in an attempt "to discuss the importance of [DHS] providing services to [her] and her allowing agency staff out to the home." N.T., 10/2/2025, at 97. That meeting lasted only eleven minutes, however, because Maternal Grandmother became "very irate" and ended the meeting. ***Id.*** at 97-98. Ms. VanWormer explained that Maternal Grandmother took issue with Mr. Nowak, the DHS housing specialist, accompanying the caseworkers to her house. ***Id.*** As stated above, Maternal Grandfather testified that he felt "intimidated" by Mr. Nowak; he perceived Mr. Nowak as thinking he was "maybe better than somebody else." ***Id.*** at 98; ***see also*** N.T., 10/20/2025, at 83. Notably, DHS brought "security" when they visited Maternal Grandparents' home because of Maternal Grandfather's behavior. N.T., 10/2/2025, at 98.

Although Maternal Grandmother denied this, the record supports the trial court's finding that Children are doing very well in their respective placements. ***Compare*** N.T., 10/20/2025, at 64-65 (Maternal Grandmother's

- 25 -

view that Children are doing poorly outside of her care), *with id.* at 38-39 (B.G.'s paternal grandmother testifying that she is doing well in her current placement), N.T., 10/2/2025, at 109 (Ms. VanWormer testifying that N.H., A.R., and Q.R. are doing well in their current placement, which is preadoptive), & DHS Exhibits 2a-2c (reports from the counseling service treating B.G., Q.R., and N.H.). All are living with individuals willing to keep them in their care long term. *See* N.T., 10/20/2025, at 108-09; N.T., 10/2/2025, at 109.

## Conclusion

Based upon our review of the record and applicable law, we conclude the trial court did not abuse its discretion in changing Children's permanency goals and removing Maternal Grandparents as parties to the dependency proceedings. The trial court correctly found that Children are in need of permanency after being removed from Maternal Grandparents nearly two years earlier and unsuccessfully returned to their physical custody from March 12, 2025, to May 27, 2025, and, further, that Children's respective foster/kinship care resources will provide them permanency. *See* Trial Court Opinion, 12/15/2025, at 10; *see also* N.T., 10/20/2025 at 108-09.

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/10/2026